**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| JIMMY OSBORNE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-13-435 |
| | § | |
| HARRIS COUNTY, TEXAS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This case involves a midnight distress call and the search and detention that resulted from it. Police dispatchers sent officers to respond to a late-night tip about a domestic disturbance. The dispatchers gave the officers an address, which turned out to be incorrect. The police went to an apartment near the address they were given and talked to the occupant outside the apartment. The officers then forcibly entered, searched the apartment, and detained the occupant. He believes that the officers had no reasonable basis for the entry, the search, the detention, or the force used to secure his compliance. He filed this civil-rights action against the officers, their supervisor, and the county that employed them, alleging violations of the Fourth and Fourteenth Amendments. The defendants moved for summary judgment on the plaintiff's constitutional claims. The county argues that the plaintiff cannot establish municipal liability. The individual officers and their supervisor argue that they are entitled to qualified immunity.

Based on the motion, the briefs, the record, and the applicable law, the court grants the motion in part and denies it in part. The county's motion for summary judgment dismissing the municipal liability claim is granted. The supervisor's motion for summary judgment dismissing the

claim against him is granted.  The individual officers' motion for summary judgment dismissing the excessive force and unlawful detention claims is granted.  The individual officers' motion for summary judgment dismissing the unlawful entry and search claim is denied.

The remaining issues are whether the four individual officers unlawfully entered and searched the apartment, violating federally protected rights.  Counsel for the remaining parties are ordered to appear for a pretrial conference on **April 9, 2015**, at 3:00 p.m. in Courtroom 11-B at 515 Rusk Street, Houston, Texas, 77002, to set a schedule and plan to resolve the remaining claims.

## I.     Background[1]

Shortly after midnight on May 24, 2011, Harris County Sheriff's Dispatch received a telephone tip.  The caller reported people yelling and throwing things in the apartment directly behind hers, and stated that it sounded as if things could become violent.  At approximately 12:36 a.m., Sheriff's Deputy Michael Fair was dispatched to respond to the reported "Disturbance/Other."  Dispatch sent the deputies to 11800 Grant Road in Cypress, Texas, and directed them to the apartment directly behind apartment 3602.  (Docket Entry No. 32-1).  The call slip notes stated:

rep can hear distb. in unkown; Bldg. 63; rep can hear arguing between male/female; throwing things; apt behind rep.

. . . .

REP CAN HEAR CURSING

. . . .

DIRECTLY BEHIND REPS APTS 3602

---

[1]  The disputed facts are viewed "in the light most favorable" to Osborne, the nonmoving party.  *See Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014).

(Docket Entry No. 32, Ex. F, at 174).

The deputies did not go to apartment 3608, which was directly behind 3602. (Docket Entry No. 32, Ex. A ¶ 4). Deputy Fair and Deputy Nichols checked the apartment next to 3602 and found it vacant. Deputy Fair "looked around to see if [he] could hear any disturbance, but [] was unable to locate any disturbance." (*Id.*).[2] He did, however, "observe[] a male in apartment 3612," where Jimmy Osborne lived. (*Id.*). When two other deputies—Guidry and Woolsey—arrived, Deputy Fair knocked on the door to 3612.

Osborne stated in his declaration that he was alone in apartment 3612. The television was at a "low to medium" volume. (Docket Entry No. 35, Ex. A, ¶ 3 (Osborne Declaration)). "There were no loud noises or voices emanating from" the apartment, and Osborne himself "heard no loud noises or voices" from "any other apartment." (*Id.*). When Deputy Fair knocked on the door, Osborne opened it, "stepped out onto [the] landing," and "closed the door behind" him. (*Id.* ¶ 4).[3] He did not talk to the deputies from inside the apartment doorway because he had to keep his dog from running out. (*Id.*). Deputies Fair, Guidry, Nichols, and Woolsey were standing nearby. They began asking Osborne about the domestic-dispute report that Dispatch had received. Osborne told the officers that he had "no idea what they were talking about" and that they clearly had the wrong apartment number. (*Id.* ¶ 5). The officers asked him again, and Osborne repeated that he had no

[2] Deputies Nichols, Guidry, and Woolsey contend that Osborne's apartment was either the unit Dispatch identified or directly behind the unit Dispatch identified. (Docket Entry No. 32, Exs. C, D, E, ¶¶ 3-4). But Osborne disputes this fact and Deputy Fair's affidavit supports Osborne's testimony. (Docket Entry No. 32, Ex. A, ¶ 4; *see also* Docket Entry No. 35, Ex. A, ¶ 3). For purposes of the summary judgment motion, this disputed fact is resolved in Osborne's favor.

[3] Deputy Fair asserts that Osborne left the door "slightly ajar." (Docket Entry No. 32, Ex. A, ¶ 5). Osborne testified that he closed the door behind him. (Docket Entry No. 35, Ex. A, ¶ 4; *see also id.*, Ex. C). This dispute is not material to the summary judgment issues and, in any event, is resolved in Osborne's favor for the purpose of this motion.

information.   Deputy Fair observed that Osborne was "acting in a nervous and obviously uncomfortable manner upon [their] arrival, which made [Fair] feel as if there were circumstances of which [he] was unaware."   (Docket Entry No. 32, Ex. A, ¶ 5).   Deputy Fair believed that "Osborne was trying to block [their] view inside the apartment."  (*Id.*).

Deputy Guidry asked Osborne who else was in the apartment.   (Docket Entry No. 35, Ex. A ¶ 6).   "[N]o one, I live alone," Osborne responded.   (*Id.*).   The deputies told Osborne that they were "going in to check."   (Docket Entry No. 32-11, at 30).   Osborne protested and refused them entry.   (*See id.*).   Despite Osborne's answer, Deputies Guidry and Nichols "moved toward the door, grabbed the door handle, opened the door," and entered Osborne's apartment, without his permission.[4]   (Docket Entry No. 35, Ex. A, ¶ 7).   Osborne testified that he "tried to go back toward the door" to "try and block the other deputies from forcing entry."   (Docket Entry No. 32-11, at 79, 82; *see also* Docket Entry No. 35, Ex. C ("I was trying to lunge forward to keep the first deputy from entering my apartment.")).   At that point, Deputy Fair "grabbed [Osborne's] left arm" and "forcefully pull[ed] [him] away from the door."   (Docket Entry No. 35, Ex. A, ¶ 6).   Osborne testified that he pushed Deputy Fair with both hands "when he was pulling [Osborne] away" from the door, saying "keep your hands off me."   (Docket Entry No. 32-11, at 51).   "Deputy Fair then grabbed [Osborne's] left wrist and began twisting it" so that he could handcuff Osborne's left hand.

---

[4]   Deputies Guidry and Nichols contend that Osborne's "door . . . was open when [they] entered" and that they "did not hear Mr. Osborne state or demand that [they] not enter his apartment."   (Docket Entry No. 32-2, ¶ 4); *see also* (Docket Entry No. 32-3, ¶ 6 ("I did not hear Mr. Osborne ask or demand that we not enter his apartment.").   But Osborne has testified to the contrary, and Deputies Fair and Woolsey acknowledge that Osborne refused permission to search.   (Docket Entry No. 32-11, at 25 (responding "No, you're not" to deputies' statement that they were "going in to check")); (Docket Entry No. 35, Ex. A, ¶ 7 (stating that, when the deputies entered the apartment, they were all "in clear visual and hearing distance of each other and each could plainly hear and see the others and myself"); (Docket Entry No. 32-4, ¶ 5 ("Mr. Osborne was asked if we could check his apartment for any person needing assistance, and Mr. Osborne responded, 'No.'").   For purposes of deciding the summary judgment motion, this factual dispute is resolved in Osborne's favor.

4

(*Id.* ¶ 8).   Osborne contends that after Deputy Fair handcuffed his left hand, he "got a hold of [Osborne's] right arm and yanked it around behind [Osborne] and put the other cuff on [Osborne's] right wrist."  (*Id.* ¶ 9).   During this "scuffle, . . . [Osborne] felt something pop in [his] right knee and [] felt great pain."  (*Id.*).

Deputy Fair contends that Osborne "resisted, both verbally and physically," the deputies' entry into the apartment and Deputy Fair's efforts to handcuff him.  (Docket Entry No. 32-1, ¶ 7). In his deposition, Osborne acknowledged that he was "trying to pull away from [Deputy Fair]" to "try and block the other deputies from forcing entry" into his apartment and that he pushed Deputy Fair with both hands.  (Docket Entry No. 32-11, at 32-33, 51).   Osborne also testified that "the incident between" Deputy Fair and himself "escalated" when the other three officers entered his apartment without his permission.  (*Id.* at 25).

Deputy Woolsey entered Osborne's apartment "and came in an[d] out several times." (Docket Entry No. 35, Ex. A, ¶ 7).   Five minutes after Deputy Fair handcuffed Osborne, Deputy Guidry "stuck his head out [of Osborne's apartment]" and "told [D]eputy Fair . . . to 'keep those cuffs on him, he's got a shitload of guns in here and I don't want him running loose while we're in here searching."  (*Id.* ¶ 11).[5]   Osborne states that he had only three guns, all "legal," and "in plain sight."  (*Id.* ¶ 12).   According to Osborne, the officers continued searching his 900-square-foot apartment for "another 10 minutes," despite the fact that the search was initiated as a welfare check in response to the domestic-disturbance tip, to see if anyone in the apartment needed emergency

---

[5]  The defendants argue that this statement should be excluded as hearsay.  (Docket Entry No. 37, at 2); *see also* FED. R. EVID. 802.  But it is not offered to prove the truth of the statement that Osborne had a specific number of guns and that Deputy Guidry did not want him unsecured during their search.  Instead, Osborne offers the statement to show what Guidry said to Deputy Fair and to hold Guidry partly responsible for Osborne's continued detention.  *See* FED. R. EVID. 801(c)(2).  In any event, the statement could be admitted on the basis that Deputy Guidry is a party opponent.  *See* FED. R. EVID. 804(d)(2)(A).

assistance.  Osborne points out that a similar welfare check for his downstairs neighbor lasted only a few minutes.  (*Id.* ¶ 13).

About three to five minutes later, Osborne overheard another officer yell "it's in the back." (*Id.* ¶ 14).  Osborne presumed this referred to "where the incident was actually taking place." (*Id.*). Deputies Guidry and Nichols came out of Osborne's apartment at that time, at least 15 minutes after beginning their search.  They "told Deputy Fair to leave the cuffs on" Osborne.  (*Id.* ¶ 15).  Deputy Nichols waited with Osborne while the others went to "where the incident was taking place." (*Id.* ¶ 15).  After another 15 to 20 minutes, Deputy Fair returned and removed Osborne's handcuffs.  The deputies had learned that although Dispatch told them that the disturbance was in the unit behind apartment 3602, it was in fact behind apartment 6302.  (Docket Entry No. 32-1, ¶ 10).

Osborne estimates that he was "in handcuffs, on [his apartment] landing, for around 35-45 minutes." (Docket Entry No. 35, Ex. A, ¶ 17).  As the defendants acknowledge, "[t]here is a factual dispute as to whether [Osborne] was detained in handcuffs while the Individual Defendants responded to the correct location of the disturbance." (Docket Entry No. 37, at 9).  The defendants have submitted Dispatch logs to support their contention that the detention was shorter.  (Docket Entry No. 32, Ex. F).  But the logs are largely consistent with Osborne's account.  At summary judgment, the court must resolve this dispute in Osborne's favor.

Osborne complained to the deputies' supervisor, Sergeant Jeffrey Gable, shortly after the handcuffs were removed, asking for the deputies' names and business cards.  Sergeant Gable refused to identify his deputies but gave Osborne his own name and a number to register a complaint with the Sheriff's Office.  Osborne returned to his apartment at 1:25 a.m.  (*Id.*).

Osborne filed a complaint with the Harris County Sheriff's Internal Affairs Department. The complaint resulted in "no discipline []or any finding [that] the activities violated" the Sheriff's Department policy. (*Id.* ¶ 20). Osborne alleges that he suffered serious knee injuries as a result of the force that Deputy Fair used to restrain him. He claims that he required medical care and incurred $15,436.67 in hospital expenses. (*Id.* ¶ 21).

In February 2013, Osborne sued the deputies, their supervisor, and Harris County under 42 U.S.C. § 1983. He alleged that the deputies violated his Fourth and Fourteenth Amendment rights by: (1) detaining him without reasonable suspicion; (2) arresting him without a warrant or probable cause; (3) searching him, his residence, and his belongings without a warrant or probable cause; and (4) using excessive force against him. (Docket Entry No. 10, ¶¶ 34-38). He alleged that the deputies' supervisor, Sergeant Jeff Gable, "was aware of what was happening to Mr. Osborne[,] including his detention[,] and had a duty to supervise but failed to intervene and prevent the unreasonable searches and seizure and excessive force." (*Id.* ¶ 40). Osborne alleged that Harris County "ratified" the deputies' actions as its "own policies, practices, customs[,] and procedures" by failing to retrain or discipline the officers in response to Osborne's complaints. (*Id.* ¶ 43). Osborne sought compensatory damages, punitive damages, and attorney's fees. (*Id.* ¶¶ 44-47).

After discovery, the defendants moved for summary judgment, arguing that the individual deputies and their supervisor are entitled to qualified immunity and that Osborne cannot show that any Harris County municipal policy was the moving force of the alleged constitutional violations. (Docket Entry No. 32). Osborne responded, the defendants replied, and Osborne filed a surreply. (Docket Entry Nos. 35, 37, 38).

Each ground for seeking summary judgment, and the responses, is analyzed below.

7

## II.     The Legal Standard for Summary Judgment

"Summary judgment is appropriate only if 'the movant shows that there is no genuine [dispute] as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting FED. R. CIV. P. 56(a)). "In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine [dispute] of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotation marks omitted).  "'If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response.'" *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant

must identify specific evidence in the record and explain how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.    The Claims Against the Deputies in Their Individual Capacities

### A.    The Legal Standard for Qualified Immunity

The deputies assert qualified immunity and argue that it precludes the § 1983 damages claims that Osborne asserts. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "In reviewing a motion for summary judgment based on qualified immunity, [courts] undertake a two-step analysis." *Luna v. Mullenix*, 773 F.3d 712, 718 (5th Cir. 2014). "First, [courts] ask whether the facts, taken in the light most favorable to the plaintiffs, show the officer's conduct violated a federal constitutional or statutory right." *Id.* (citing *Tolan*, 134 S. Ct. at 1865). "Second, [courts] ask 'whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004)). "A court has discretion to decide which prong to consider first." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "Claims of qualified immunity must be evaluated in the light of what the officer knew at the time he acted, not on facts discovered subsequently." *Luna*, 773 F.3d at 718.

9

But "[a]s the Supreme Court has recently reaffirmed, 'in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Id.* (quoting *Tolan*, 134 S.Ct. at 1863).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lytle v. Bexar County*, 560 F.3d 404, 410 (5th Cir. 2009) (quotations omitted). "When considering a defendant's entitlement to qualified immunity, [a court] must ask whether the law so clearly and unambiguously prohibited his conduct that 'every reasonable official would understand that what he is doing violates [the law].'" *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2083, 2084 (2011)). "To answer that question in the affirmative, [the court] must be able to point to controlling authority — or a 'robust consensus of persuasive authority' — that defines the contours of the right in question with a high degree of particularity." *Id.* (quoting *Al-Kidd*, 131 S. Ct. at 2084).

"Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (quotations omitted). "[W]hile the Supreme Court has stated that 'courts should define the 'clearly established' right at issue on the basis of the 'specific context of the case,' it has also recently reminded [courts] that [they] 'must take care not to define a case's 'context' in a manner that imports genuinely disputed factual

10

propositions.'"  *Luna*, 773 F.3d at 724-25 (quoting *Tolan*, 134 S.Ct. at 1866).  A plaintiff has the

burden of overcoming the qualified immunity defense.  *Bennett v. City of Grand Prairie*, 883 F.2d

400, 408 (5th Cir. 1989).

      **B.**     **Analysis**

The individual defendants argue that they are entitled to qualified immunity on each of

Osborne's claims because there are no genuine fact disputes material to determining whether they

violated his clearly established constitutional rights.  Each defendant's actions must be considered

separately, but this "does not require courts to conduct a separate analysis for each officer in those

cases where their actions are materially indistinguishable."  *Meadours v. Ermel*, 483 F.3d 417, 421-

22 & n.3 (5th Cir. 2007).  A court must, however, "*consider* each officer's actions."  *Id.* at 422 n.3

(emphasis original).

Each defendant's role in the entry into and search of the apartment, the detention, and the

use of force, is analyzed below.

      **1.**     **The Claim of an Unconstitutional Entry and Search**

         **a.**     **A Constitutional Violation**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.

"[S]earches and seizures inside a home without a warrant are presumptively unreasonable."

*Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citation and quotations omitted).  "Although as

a general matter, warrantless searches 'are *per se* unreasonable under the Fourth Amendment,' there

are 'a few specifically established and well-delineated exceptions' to that general rule."  *City of*

*Ontario, Cal. v. Quon*, 560 U.S. 746, 760 (2010) (quoting *Katz v. United States*, 389 U.S. 347, 357

(1967)); *see also Rice v. Relia Star Life Ins. Co.*, 770 F.3d 1122 (5th Cir. 2014) ("There are, however, circumstances in which a warrantless entry into a home is not a constitutional violation.").

The individual defendants rely on the exigent-circumstances exception to the warrant requirement.  (Docket Entry No. 35, at 39, 41, 43).  "Under the exigent circumstances exception to the warrant requirement, the Supreme Court has recognized that police officers are not required to obtain a warrant where 'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" *Rice*, 770 F.3d at 1131 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).  "'Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Id.* (quoting *Brigham City*, 547 U.S. at 403).

"Because it is essentially a factual determination, there is no set formula for determining when exigent circumstances may justify a warrantless entry." *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) (quotations omitted). The court must view the circumstances objectively, not on the basis of the officers' subjective motivations. *See Brigham City*, 547 U.S. at 404. "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" *Jones*, 239 F.3d at 720. But "the police bear a heavy burden . . . when attempting to demonstrate an urgent need that might justify warrantless searches." *Welsh v. Wisconsin*, 466 U.S. 740, 749–750 (1984).

In *Brigham City v. Stuart*, 547 U.S. 398 (2006), police officers responded to a noise complaint received the early hours of the morning.  "As they approached the house, they could hear

from within an altercation occurring, some kind of fight." *Id.* at 406 (quotations omitted). The officers followed the noise to the back of the house, where they saw juveniles drinking beer in the backyard and a fight taking place in the kitchen. They watched through the window as a juvenile held by adults broke free and punched one adult in the face. He recoiled to the sink, spitting blood. *Id.* The Court found it "plainly reasonable" for the officers to enter the house because they had "an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning." *Id.*

In *Michigan v. Fisher*, 558 U.S. 45 (2009) (per curiam), the police officers responded to a report that a man inside a specific house was "'going crazy.'" *Id.* at 45. The police found "a household in considerable chaos," with broken windows, shattered glass on the ground, a smashed truck with blood on the hood, blood on the house door, and a man, visible through a window, "inside the house, screaming and throwing things." *Id.* at 45–46. The Court observed that "[a] straightforward application of the emergency aid exception, as in *Brigham City*, dictate[d] that the officer's entry was reasonable." *Id.* at 48. "Just as in *Brigham City*, the police officers [] were responding to a report of a disturbance." *Id.* "Just as in *Brigham City*, when they arrived on the scene they encountered a tumultuous situation in the house—and here they also found signs of a recent injury, perhaps from a car accident, outside." *Id.* "And just as in *Brigham City*, the officers could see violent behavior inside." *Id.* "Although [the officers] did not see punches thrown, as did the officers in *Brigham City*, they did see Fisher screaming and throwing things." *Id.* It was therefore "objectively reasonable to believe that Fisher's projectiles might have a human target (perhaps a spouse or a child), or that Fisher would hurt himself in the course of his rage." *Id.* These circumstances made the officer's warrantless entry reasonable under the Fourth Amendment. *Id.*

13

In *Ryburn v. Huff*, 132 S. Ct. 987 (2012) (per curiam), the Supreme Court reversed the Ninth Circuit's denial of qualified immunity on a warrantless search claim because the circumstances would have led a reasonable officer to conclude that there "was an objectively reasonable basis for fearing that violence was imminent." *Id.* at 992.  In *Ryburn*, a high-school principal had informed the officer-defendants that "a student, Vincent Huff, was rumored to have written a letter threatening to 'shoot up' the school." *Id.* at 988.  After interviewing Huff's classmates, the officers learned that he "had been absent from school for two days," that "he was frequently subjected to bullying," and that "one of [Huff's] classmates believed that [he] was capable of carrying out the alleged threat." *Id.*  The officers went to Huff's home to interview him.  They knocked on the door several times and dialed the home telephone, without success.  *See id.*  When they reached Huff's mother on her cell phone, she told them that "she was inside the house" with Huff.  When the officers asked to speak with her, she "hung up the phone." *Id.*  Ms. Huff and her son, Vincent, came outside.  The officers told them about the alleged threats and asked if they could interview Vincent.  Ms. Huff refused. When the officers asked if there were any firearms in the house, Ms. Huff turned around and ran back inside.  Fearing for their own safety, the officers followed her into the home.

The district court concluded that the officers had a reasonable basis for believing that there was an imminent threat of violence that justified their warrantless entry into the home.  The Supreme Court agreed "based on the facts as found by the District Court." *Id.* at 992.  The Court described those facts:

> "[T]he officers testified that a number of factors led them to be concerned for their own safety and for the safety of other persons in the residence: the unusual behavior of the parents in not answering the door or the telephone; the fact that Mrs. Huff did not inquire about the reason for their visit or express concern that they were investigating her son; the fact that she hung up the telephone on the officer; the fact that she refused to tell them whether there were guns in the house; and finally, the

> fact that she ran back into the house while being questioned. That behavior, combined with the information obtained at the school—that Vincent was a student who was a victim of bullying, who had been absent from school for two days, and who had threatened to 'shoot up' the school—led the officers to believe that there could be weapons inside the house, and that family members or the officers themselves were in danger."

*Id.* at 991-92 (quoting district court).

The defendants justify their warrantless entry into Osborne's apartment on their reasonable belief, based on the report of a domestic disturbance, that someone in the apartment might need help. Deputies Guidry, Nichols, and Woolsey contend that they entered Osborne's apartment "in good faith, based on the totality of circumstances," including "the information . . . provided to the Officer Defendants by Dispatch," Osborne's "behavior when the Officer Defendants first made contact with him," and "the possibility that there might be someone inside in need of medical attention or in distress." (Docket Entry No. 32, at 39, 42, 44).

The record discloses disputed facts material to determining whether the officers had an "objectively reasonable basis for believing that an occupant [of Osborne's apartment was] seriously injured or imminently threatened with such injury." *See Brigham City*, 547 U.S. at 400. The Dispatch information the officers received was that there was a "Disturbance/other" in the apartment directly *behind* apartment 3602. The deputies reasonably but mistakenly believed that the reported disturbance was directly behind apartment 3602. The deputies went to apartment 3602 and did not hear any disturbance. They checked the adjacent apartment, which was vacant. They did *not* check the apartment directly behind 3602. Instead, they focused on Osborne's apartment, number 3612, which is not behind 3602, because they spotted a "male" through the window. There was no noise or any indication of a problem in Osborne's apartment. Unlike the officers in *Brigham City*, *Fisher*, and *Ryburn*, the deputies were not sent to Osborne's apartment. Unlike the officers in *Brigham City*,

*Fisher*, and *Ryburn*, the deputies did not hear any noise, witness any violence, or observe any signs that violence had recently occurred or was about to take place.

The officers knocked on Osborne's door.  He "opened the door, stepped out onto [his] landing[,] and closed the door behind" him to avoid letting his dog escape.  (Docket Entry No. 35, Ex. A, ¶ 4).  He repeatedly told the officers that they had the wrong apartment and that no one else was inside.  He disputes that he was "nervous."  These disputed issues preclude summary judgment for the officers on their qualified immunity defense to the warrantless entry claim.

The case law is consistent with this result.  *See Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1165 (9th Cir. 2014) (holding that the officer was not entitled to qualified immunity under the emergency-aid exception when he "arrived at a home to find a pattern consistent with either lawful or unlawful activity, but with no evidence of weapons, violence, or threats"), *cert. denied*, No. 14-528, 2015 WL 731872 (U.S. Feb. 23, 2015); *United States v. Timmann*, 741 F.3d 1170, 1179 (11th Cir. 2013) (observing that the cases applying the emergency-aid exception "have in common the indicia of an urgent, ongoing emergency, in which officers have received emergency reports of an ongoing disturbance, arrived to find a chaotic scene, and observed violent behavior, or at least evidence of violent behavior."); *Nelms v. Wellington Way Apartments, LLC*, 513 F. App'x 541, 545 (6th Cir. 2013) ("[E]ach time this court has upheld a warrantless entry based upon the emergency aid exception, credible and reliable evidence established the potential for injury to the officers or others and the need for swift action." (quotations and alterations omitted)); *Storey v. Taylor*, 696 F.3d 987, 996 (10th Cir. 2012) ("[A] report of a loud argument—without more—that has ceased by the time an officer arrives, although relevant to the exigent circumstances inquiry, does not alone create exigent circumstances to justify a warrantless arrest."); *United States v. Hill*,

649 F.3d 258, 265 (4th Cir. 2011) (concluding that exigent circumstances did not justify an officer's warrantless entry based on the officer's observations that:  the door looked like it had been kicked in; there was some noise inside and someone home but no response; an occupant had previously called the police weeks before to remove the defendant; and it "sounded like someone attempting to lock a latch on the door"); *see also Georgia v. Randolph*, 547 U.S. 103, 118 (2006) (affirming the "the authority of the police to enter a dwelling to protect a resident from domestic violence; *so long as they have good reason to believe such a threat exists*" (emphasis added)).

Nor did Osborne's "scuffle" with Deputy Fair and attempt to impede the deputies' entry justify either their entry or the ensuing search.  Osborne testified that after he refused to allow the officers to enter the apartment, Deputy Fair "forcefully pull[ed] [him] away from the door" while Deputies Guidry and Nichols drew their guns and said "we're going in to check."  (Docket Entry No. 35, Ex. A, ¶ 7).  Osborne testified that "it was clear [D]eputy Guidry intended to force entry as he moved toward the door, grabbed the door handle, opened the door, and then he and [D]eputy Nichols proceeded into [his] apartment with weapons drawn."  (*Id.*).  Osborne unsuccessfully pulled back towards the door to try to block them from entering.  Although exigent circumstances may justify entry, police may not "create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment."  *Kentucky v. King*, 131 S. Ct. 1849, 1858 & n.4 (2011).  Any exigency relating to Osborne's resistance stemmed from the deputies' efforts to force entry into his apartment.  His resistance could not alone justify entry for a protective sweep, for example, because that requires that the officers "have entered legally and for a legitimate law enforcement purpose." *See United States v. Mata*, 517 F.3d 279, 286 (5th Cir. 2008).

Similarly, none of the deputies contends that they observed Osborne's firearms before entering his apartment. This case is unlike those involving exigent circumstances arising when officers see weapons in plain view. *Cf. United States v. Jones*, 239 F.3d 716, 720-21 (5th Cir. 2001) (affirming an officer's warrantless entry based on exigent circumstances because the officer, while investigating a complaint of criminal activity, "stood before an open door and observed a handgun resting on the kitchen table," which justified entry "to ensure his safety and protect his fellow officers"). The deputies' subsequent discovery of Osborne's firearms, after they entered his apartment, cannot justify the entry itself, or subsequent search, which requires that the officers "have entered legally and for a legitimate law enforcement purpose." *Mata*, 517 F.3d at 286; *cf. United States v. Rodriguez*, 601 F.3d 402, 406-07 (5th Cir. 2010) (holding that officers who had obtained consent to enter the defendant's trailer and then observed in plain view "a firearm at the scene of a domestic altercation . . . acted reasonably in securing the scene by sweeping the trailer to determine whether other persons were present who might access that firearm.").

Viewing the disputed facts in Osborne's favor for this motion, a jury could find that each of the three deputies participating directly in the search—Guidry, Nichols, and Woolsey—violated the Fourth Amendment when they entered and searched Osborne's apartment without his consent. Deputies Guidry and Nichols entered Osborne's apartment before Woolsey, but Woolsey "also made entry . . . and came in an[d] out several times." (Docket Entry No. 35, Ex. A, ¶ 7). Deputy Fair did not enter Osborne's apartment, but he restrained Osborne while the other deputies searched his apartment. *See Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) ("[A]n officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983."); *Whitley v. Hanna*, 726 F.3d 631, 646 n.11 (5th

18

Cir. 2013) ("Although *Hale* most often applies in the context of excessive force claims, other constitutional violations also may support a theory of bystander liability."). Resolving the disputed facts in Osborne's favor, a reasonable jury could find that Fair "(1) [knew] that [his] fellow officer[s] [were] violating [Osborne's] constitutional rights"; (2) that he had "a reasonable opportunity to prevent the harm"; and (3) chose "not to act." *See Whitley*, 726 F.3d at 646-67.

There are disputed facts material to determining whether the entry and search was unlawful. The disputed facts, viewed in Osborne's favor, show that the deputies had little basis to connect the illegal conduct they suspected to the need to enter Osborne's apartment. Even given the incorrect information from Dispatch about where the domestic disturbance was located, the deputies had no reasonable basis to suspect Osborne's apartment. The Dispatch call stated that the "disturbance/other" was reported in the apartment directly behind number 3602, which the deputies did not check and which was not Osborne's apartment. The officers did not see or hear any signs of a disturbance outside Osborne's apartment. Even if seeing a person in the apartment justified the deputies' knocking on the door, construing the disputed facts in Osborne's favor, neither these circumstances nor Osborne's actions leading up to the entry and search show a basis for finding, as a matter of law, qualified immunity on the claim of an unconstitutional entry and search.

### b.    A Clearly Established Right

The remaining qualified immunity issue is whether the deputies had fair notice that their actions violated a clearly established right. The case law shows that at the time of the search, the right to be free from a warrantless forced entry and search, absent exigent circumstances, was clearly established. That same case law also shows that an exigent-circumstances exception to the warrant requirement did not apply in the circumstances the officers faced.

19

The Supreme Court cases denying motions to suppress or granting qualified immunity based on the emergency-aid exception to the warrant requirement confirm that a reasonable officer would have fair warning that, construing the disputed facts in Osborne's favor, the deputies' actions could violate Osborne's clearly established rights.  In *Brigham City v. Stuart*, the Court first concluded that officers may "enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." 547 U.S. at 400.  In that case, officers responding to a noise complaint about a specific residence heard shouting from inside the house, saw two juveniles drinking beer in the backyard, and saw, through a screen door and windows, people fighting in the home, including one person spitting blood into a sink. *Id.* at 401.  In *Michigan v. Fisher*, the Court found emergency enough to justify warrantless entry when officers investigating a report that a man inside a house was "'going crazy'" found evidence of "considerable chaos," blood on the house door, and a man, visible through a window, "inside the house, screaming and throwing things."  558 U.S. at 45–46.

*United States v. Troop*, 514 F.3d 405 (5th Cir. 2008), is also illustrative.  In *Troop*, a Border Patrol agent witnessed a vehicle drop off "several individuals at a location known to be used by alien smugglers."  *Id.* at 407.  After the agent radioed for assistance, he and his fellow agents "found footprints of five individuals that they believed were illegal aliens and began to track them."  *Id.* They "followed the tracks for about four or five miles" in ninety-degree temperature to a nearby town.  *Id.*  They believed that the footprint indentations indicated "that the individuals were fatigued."  *Id.*  The agents eventually followed the tracks to the defendant's house.  They knocked on the door and announced their presence, but no one responded.  Concerned that the suspected undocumented immigrants were in need of immediate aid, the officers "enter[ed] the house to make

20

sure the men were all right."   *Id.* at 408.   The Fifth Circuit held that the government failed to

demonstrate exigent circumstances even though the agents suspected that the undocumented

immigrants had "walked some distance in ninety-degree heat and showed signs of fatigue at the end

of their journey as evidence of physical distress."   The court explained:

> there was no evidence of medical distress requiring immediate aid, such as loss of
> blood, signs of physical illness, or evidence that an individual had to be carried or
> dragged.  The Government also did not present any evidence of what type of medical
> distress is typically produced by a four-mile walk in the heat at night, which might
> have indicated that it was probable that the suspected aliens needed aid.  Absent any
> such evidence, it was unreasonable for the agents to conclude that the suspected
> aliens likely needed immediate aid based solely on the fact that the aliens showed
> fatigue.

*Id.* at 410.  Here, by contrast, the deputies observed no evidence of distress or an ongoing emergency

at or near Osborne's apartment.

Other jurisdictions have reached similar conclusions in cases involving similar

circumstances. *See United States v. Davis*, 290 F.3d 1239, 1244 (10th Cir. 2002) (finding no exigent

circumstances justifying entry when police responded to a domestic disturbance report, officers

heard no noise, the defendant told officers that his wife was out of town, and the wife appeared at

the door seemingly unharmed but resisted the husband's efforts to close the door); *Hannon v. State*,

207 P.3d 344, 348 (Nev. 2009) (suppressing evidence found after an officer's warrantless entry

because the searching officer "arrived at a quiet apartment in response to a 911 dispatch call

regarding a possible domestic disturbance that—by all accounts—seemed to have already

dissipated" and "had no reason to believe that [the defendant] or [his girlfriend] had been injured,

and had even less reason to believe that [the defendant's] apartment may have harbored an

unidentified third person in need of emergency assistance"); *United States v. Washington*, 573 F.3d

279, 287–88 (6th Cir. 2009) (rejecting the government's argument that "an ongoing criminal

trespass, on its own, constitutes an exigency that overrides the warrant requirement" for officers who entered an arrestee's home without a warrant seven days after arresting him based on his landlord's report that there had been "a great deal of foot traffic" into the apartment and that "a tenant had seen one man enter the unit with a gun," because this evidence amounted to "the vague potential for harm to persons or property as opposed to an imminent or ongoing harm"); *United States v. Moss*, 963 F.2d 673, 675, 679 (4th Cir. 1992) (concluding that a park ranger who saw an illegally parked vehicle outside a cabin that was supposed to be unoccupied and "feared the owner might be lost or hurt" lacked "any objectively reasonable perception of an emergency" to justify his warrantless entry into the cabin); *cf. United States v. Taylor*, 624 F.3d 626 (4th Cir. 2010) (emergency-aid exception justified warrantless entry into a house when the police sought to identify the parents of a four-year-old child, and she identified the house as where she lived); *United States v. Layman*, 244 F. App'x 206, 211 (10th Cir. 2007) (a warrantless entry was permissible based on "information that [the plaintiff], a wanted felon, was staying at the residence," marks "in the grass indicat[ing] someone had been staying there and could be inside," and "[t]he strength of the chemical smell . . . indicat[ing] that if someone was inside, they might be unconscious or incapacitated").

These cases and others show that the right to be free from a warrantless forced entry into a residence unless there is a reasonable basis to believe that the emergency-aid exception is present was clearly established when the deputies entered Osborne's apartment without a warrant.

The facts here, while disputed, are far different. The deputies, unlike the officers in *Brigham City* and *Fisher*, lacked an "objectively reasonable basis for believing that an occupant [was] seriously injured or imminently threatened with such injury." *Brigham City*, 547 U.S. at 403; *Fisher*, 558 U.S. at 47-48. The deputies had no particularized knowledge about Osborne, his

apartment unit, or any alleged victim that could support such a conclusion.  Dispatch had not identified Osborne or his apartment number as the location of the reported "disturbance/other."  Nor did Dispatch provide the deputies with information about the alleged disturbance supporting a conclusion that immediate aid was necessary in Osborne's apartment.   The report of a "disturbance/other" between a male and a female in the apartment behind number 3602—which the deputies did not check—and Osborne's perceived nervousness when he answered the deputies' knock and talked to them outside his apartment door, did not give the deputies an objectively reasonable basis for fearing that violence was imminent in Osborne's apartment.  His apartment was not behind apartment 3602, and there was no noise or other sign of disturbance at his apartment. The deputies had fair warning that a warrantless entry based on the emergency-aid exception, viewing the disputed facts in the light most favorable to Osborne, violated his clearly established rights.[6]

Neither Guidry, Woolsey, and Nichols—the searching deputies—nor Fair—the restraining deputy—is entitled to qualified immunity on Osborne's unlawful-entry claim based on the emergency-aid exception to the warrant requirement.

### 2.   The Detention

The next issue is whether the deputies are entitled to qualified immunity on Osborne's detention claim.  Even if the initial detention was proper, Osborne argues that extending it for the

---

[6] *Ryburn v. Huff*, 132 S. Ct. 987 (2012) (per curiam), is not to the contrary.  In *Ryburn*, the Court reversed a denial of qualified immunity because "[a] reasonable police officer could read [the Court's decisions in *Brigham City*, *Mincey*, and *Randolph*] to mean that the Fourth Amendment permits an officer to enter a residence if the officer has a reasonable basis for concluding that there is an imminent threat of violence."  *Id.* at 990.  But the officers in *Ryburn* were responding to a specific residence based on the principal's reports of a student who had allegedly threatened to "shoot up" the school, and the student's mother reacted to the officers' questions regarding guns in the home—turning around and running inside—in a manner that made the officers reasonably "fear that violence was imminent."  *Id.* at 992.

35-45 minutes between the deputies' entry into his apartment and their removal of the handcuffs and departure was unreasonable.

Unlawful detention and arrest claims "implicate the Fourth Amendment's proscription against unreasonable seizures." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 845 (5th Cir. 2009).   In general, there are three types of encounters between police and individuals.   A "consensual encounter," in which the individual willingly agrees to speak to police, may be initiated by police without any objective level of suspicion.   Without more, a consensual encounter does not amount to a Fourth Amendment "seizure."   *United States v. Cooper*, 43 F.3d 140, 145 (5th Cir. 1995) (citing *Florida v. Bostick*, 501 U.S. 429, 435 (1991)).   A "limited investigative stop" is permissible if there is a "reasonable suspicion" that a person has committed or is about to commit a crime.   An arrest must be based on probable cause.   *Id.* at 146.

A court examines the totality of the circumstances to determine whether a reasonable person would have believed that he was free to leave or to refuse to consent to a search.   *See Bostick*, 501 U.S. at 437; *United States v. Gonzales*, 79 F.3d 413, 420 (5th Cir.), *cert. denied*, 519 U.S. 869 (1996); *see also INS v. Delgado*, 466 U.S. 210, 215 (1984) (stating that a consensual encounter between an officer and a citizen "can be transformed into a seizure or detention within the meaning of the Fourth Amendment, if, in view of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").   The test is objective.   *Michigan v. Chesternut*, 486 U.S. 567, 573–74 (1988).   This objective analysis, focusing on the officers' conduct and the context in which it occurs, allows law enforcement officers to know whether their conduct will violate the Fourth Amendment.   *Id.*

24

Only unreasonable searches and seizures violate the Fourth Amendment. *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (stating that the "touchstone of the Fourth Amendment is reasonableness" (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991))). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Id.* While police questioning is not itself a seizure, continued detention without a reasonable suspicion that the individual has committed a crime or is about to violates the Fourth Amendment right to be free from an unreasonable seizure. *Delgado*, 466 U.S. at 216 (citing *Brown v. Texas*, 443 U.S. 47, 49 (1979)).

Limited investigative stops or detentions, known as *Terry* stops, require a "reasonable, articulable suspicion that a person has committed or is about to commit a crime." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry*, 392 U.S. at 21). Although "[r]easonable suspicion" is "considerably easier for the Government to establish than probable cause," *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir. 1993), *cert. denied*, 511 U.S. 1060 (1994) (citing *United States v. Wangler*, 987 F.2d 228, 230 (5th Cir. 1993)), individualized suspicion of wrongdoing is required. *See Chandler v. Miller*, 520 U.S. 305, 308 (1997). An officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that [limited] intrusion." *Terry*, 392 U.S. at 21; *accord United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Delaware v. Prouse*, 440 U.S. 648, 653–55 (1979). Courts examine "whether the officer's action was justified at its inception"—that is, whether reasonable suspicion was then present—and whether the stop "was reasonably related in scope to the circumstances which justified the interference in the first place." *See Terry*, 392 U.S. at 451; *Sokolow*, 490 U.S. at 19-20.

The defendants argue that they initially detained Osborne based on a reasonable suspicion that he was linked to illegal activity and to ensure officer safety. They point to *Brown v. Lynch*, 524

F. App'x 69, 76 (5th Cir. 2013), for the proposition that "[h]andcuffing a suspect does not automatically convert an investigatory detention into an arrest requiring probable cause." (Docket Entry No. 32, at 33).   In *Brown*, the court clarified "that handcuffing a suspect without probable cause" may be constitutional, depending on the circumstances. *Id.* n.27.[7]  In *United States v. Jordan*, 232 F.3d 447, 450 (5th Cir. 2000), the court also observed that "[h]andcuffing a suspect does not automatically convert an investigatory detention into an arrest requiring probable cause."   *Jordan* is instructive.   In that case, the officers "first asked Jordan to put his hands on the hood of the car, but he refused to do so." *Id.* at 450.   Jordan was "acting nervously." *Id.*   When "one officer grabbed Jordan's arm and told him to calm down," Jordan "jerked away and walked towards the officers in 'an aggressive-type manner.'" *Id.*   "Under those circumstances," the Fifth Circuit concluded, "the officers did not act unreasonably in handcuffing Jordan long enough to frisk him." *Id.*

In this case, Osborne testified that he tried to block the deputies from entering his apartment, pulled away from Deputy Fair when he tried to secure Osborne's cooperation, and pushed Deputy Fair with both hands.   According to Osborne, when the deputies tried to enter Osborne's apartment, Deputy Fair "grabbed [Osborne's] left arm and" "forcefully pull[ed] [him] away from the door." (Docket Entry No. 35, Ex. A, ¶ 6).   When Osborne told Deputy Fair to "keep your hands off me,"

---

[7] *See United States v. Johnson*, 445 F.3d 793, 795 (5th Cir. 2006) (officers shot at while investigating disturbance; anonymous caller named the shooter and reported that he was hiding at a specific address; another officer found shell casings in the street immediately in front of that address; officers spotted the suspect pacing in a back bedroom of that house and learned that it was not his house and that children were inside); *United States v. Lewis*, 208 F. App'x 298, 299 (5th Cir. 2006) (officers received report of an armed man making threats; suspect made statement that officer reasonably took as admission that he had a gun; suspect had not yet been frisked); *Jordan*, 232 F.3d at 450 (man suspected of robbery stopped by two officers; refused order to place hands on car; jerked arm away from officer who had grasped it; wouldn't answer questions; had not been frisked); *United States v. Campbell*, 178 F.3d 345, 349 (5th Cir. 1999) (three officers attempting to control three armed bank robbery suspects; suspect, although lying on the ground, had not been frisked).

Deputy Fair "grabbed [Osborne's] left wrist and began twisting it" until he could handcuff Osborne's left hand. (*Id.* ¶ 8). After Deputy Fair secured Osborne's left hand, he "got a hold of [Osborne's] right arm and yanked it around behind [Osborne] and put the other cuff on [Osborne's] right wrist." (*Id.* ¶ 9). During this "scuffle, . . . [Osborne] felt something pop in [his] right knee and [] felt great pain." (*Id.*). Osborne testified in his deposition that he was "trying to pull away from [Deputy Fair]" to "try and block the other deputies from forcing entry" into his apartment. (Docket Entry No. 32-11, at 32-33). Osborne testified that he resisted Deputy Fair's attempts to place him in handcuffs and pushed Deputy Fair with both hands. (Docket Entry No. 32-11, at 51). Viewing the disputed facts in the light most favorable to Osborne, Deputy Fair's initial detention was reasonable.

Osborne argues that the scope of the detention was unreasonable and transformed the *Terry* stop into a full-blown arrest requiring probable cause. "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). "A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Id.*

In *Sharpe*, the Supreme Court "reject[ed] the contention that a 20-minute stop is unreasonable when the police have acted diligently and a suspect's actions contribute to the added delay about which he complains." *Id.* at 688. In that case, "[d]uring most of Savage's 20-minute detention, [the agent] was attempting to contact [another officer] and enlisting the help of the local

police who remained with Sharpe while [the agent] left to pursue [the other officer] and the pickup." *Id.* "Once [the agent] reached Officer Thrasher and Savage, he proceeded expeditiously: within the space of a few minutes, he examined Savage's driver's license and the truck's bill of sale, requested (and was denied) permission to search the truck, stepped on the rear bumper and noted that the truck did not move, confirming his suspicion that it was probably overloaded.  He then detected the odor of marihuana." *Id.*

This case is similar in relevant respects to *Sharpe*.  The defendants acknowledge that "[t]here is a factual dispute as to whether [Osborne] was detained in handcuffs while the Individual Defendants responded to the correct location of the disturbance."  (Docket Entry No. 37, at 9). Viewing the disputed facts in the light favorable to Osborne shows that he was detained in handcuffs for 35 to 45 minutes, well after the officers finished searching his apartment and after they discovered that the disturbance had in fact been reported at another apartment.  Even if Deputy Fair did not violate clearly established law by handcuffing Osborne while the other deputies searched the apartment, keeping him handcuffed for 35 to 45 minutes was not "reasonably related in scope to the investigatory detention."  *Short v. West*, 662 F.3d 320, 327 (5th Cir. 2011); *see also United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993) ("A prolonged investigative detention may be tantamount to a de facto arrest, a more intrusive custodial state which must be based upon probable cause rather than mere reasonable suspicion.").

Unlike the defendant in *Sharpe*, however, once handcuffed, Osborne played no role in prolonging the detention.  Deputy Fair had no reason to detain Osborne longer than was needed for a protective sweep of the small apartment after the guns were found.  The Fifth Circuit has held that prolonging detention by as long as "three minutes" after a reasonable suspicion of wrongdoing is

gone can violate the Fourth Amendment.  *See United States v. Jones*, 234 F.3d 234, 241 (5th Cir. 2000) (holding that although the "basis for the stop was essentially completed when the dispatcher notified the officers about the defendants' clean records," the officers continued the stop for three minutes before obtaining consent to search the vehicle); *see also United States v. Brigham*, 382 F.3d 500, 510-11 (5th Cir. 2004) (en banc).  A protective sweep cannot justify the duration of the search or the detention related to it.  *See Maryland v. Buie*, 494 U.S. 325, 327 (1990) ("A 'protective sweep' is a quick and limited search of premises" that must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding").[8]

Deputy Fair argues that he had probable cause to handcuff and detain or arrest Osborne after he physically resisted the deputies' efforts to enter and search the apartment.  *See* TEX. PEN. CODE § 38.03.  Osborne admitted in his deposition that he pulled away from Deputy Fair and tried to block the other deputies from entering his apartment.  "Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000).  "A person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction from effecting an arrest [or] search . . . by using force against the peace officer or another."  TEX. PEN. CODE § 38.03(a).  "It is no defense to prosecution under this section that the arrest or search was unlawful."  *Id.* § 38.03(b).

---

[8]  The defendants do not assert that the length of detention was necessary to verify whether the firearms they discovered in Osborne's apartment were legally present.

"In Texas, the act of resisting can supply probable cause for the arrest itself." *Ramirez v. Martinez*, 716 F.3d 369, 376 (5th Cir. 2013). "The great weight of Texas authority indicates that pulling out of an officer's grasp is sufficient to constitute resisting arrest." *Id.* (citing cases); *see also id.* ("[U]nder Texas law Deputy Martinez could have reasonably concluded that Ramirez committed the offense of resisting arrest when Ramirez pulled his arm away from Deputy Martinez's grasp."); *Vactor v. State*, 181 S.W.3d 461, 467 (Tex. App.–Texarkana, 2005, pet. denied) ("[O]nce Vactor forcefully resisted Webb's attempt to place him in handcuffs for the purpose of safely performing a *Terry* search, Vactor committed the new criminal offense of resisting a search.").

Osborne testified that he tried to block the deputies from entering his apartment, pulled away from Deputy Fair when he attempted to secure Osborne, and pushed Deputy Fair with both hands. Based on this undisputed testimony, Deputy Fair had probable cause to arrest Osborne under § 38.03(a). Osborne argues that he lacked the *mens rea* to commit this crime, but § 38.03(a) is not a specific-intent crime. *See Pyykola v. State*, 814 S.W.2d 462, 464 (Tex. App.–Houston [14th Dist.] 1991, pet. refused) ("Resisting arrest, requires that the actor 'intentionally' committed the conduct, thus indicating that this offense is not a 'specific result' type of crime.").

Even if Deputy Fair lacked probable cause to arrest Osborne for resisting the search, he is entitled to qualified immunity on the detention claim because a reasonable officer could have believed that he had probable cause to arrest Osborne. *See Huang v. Harris Cnty.*, 264 F.3d 1141, at *8 (5th Cir. 2001) (concluding that "a reasonable officer would have believed he had probable cause to arrest Huang for resisting arrest" when, "after having been placed under arrest, Huang clung to both her front door and then to her security gate in an effort to resist [the officer's] attempt to

30

handcuff her" and "she resisted [the officer's] attempts to place her under arrest by entwining her legs inside the iron security gate").

Deputy Fair is entitled to qualified immunity on Osborne's claim that detaining him was unconstitutional. Osborne also appears to allege that the other deputies are liable for unconstitutionally detaining him under a theory of bystander liability. *See Hale*, 45 F.3d at 919; *see also Whitley*, 726 F.3d at 646-67. The other deputies, including Guidry, who told Deputy Fair to keep Osborne handcuffed because of safety concerns, are also entitled to qualified immunity because bystander liability requires at least one officer to be liable. *See Kitchen v. Dallas Cnty.*, 759 F.3d 468, 481 (5th Cir. 2014) ("Defendants-Appellees correctly observe that bystander liability arises under *Hale* only where the plaintiff can allege and prove another officer's use of excessive force." (citation and quotations omitted)).

### 3.      The Excessive-Force Claim

Osborne argues that Deputy Fair used unreasonable force in restraining and handcuffing him. Osborne's "excessive force claim is separate and distinct from [his] unlawful [detention] claim, and [the court] must therefore analyze the excessive force claim without regard to whether the [detention] itself was justified." *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007). "To establish a claim of excessive force under the Fourth Amendment, plaintiffs must demonstrate: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quotations omitted). Osborne stated in his declaration that he felt a "pop" in his knee when Deputy Fair restrained him and suffered serious knee injuries requiring $15,436.67 in hospital expenses. (Docket Entry No. 35, Ex. A, ¶ 21). Deputy Fair disputes Osborne's account, but at

summary judgment the court resolves the disputes in Osborne's favor.  *See Tolan*, 134 S.Ct. at 1863 ("[I]n ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").  The disputed facts, seen in this light, would allow a reasonable jury to find that Osborne suffered injury directly and only from Deputy Fair's use of force.  The issue is whether that use of force was clearly excessive.

"[W]hether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'"  *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  "Factors to consider include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"  *Id.* (quoting *Graham*, 490 U.S. at 396).  The "'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."  *Id.* at 397.

A court considers only the information available to the officers at the time.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Connor*, 490 U.S. at 396.  A court must also recognize that officers often must make split-second decisions in stressful situations.  *Id.*  Finally, officers cannot be personally liable unless the law at the time clearly established that the use of force was unreasonable.  *Id.*

Osborne argues that "no force was necessary as he was not doing anything that would necessitate the use of force" when Deputy Fair "grabbed [him]" and "caus[ed] pain and [] severe injury."  (Docket Entry No. 35, at 18).  But even viewing the disputed facts in the light favorable

32

to Osborne, Deputy Fair's use of force was objectively reasonable.  As noted, Osborne testified that he resisted Deputy Fair's efforts to allow the other officers to enter the apartment.  Osborne also testified that "the incident between" Deputy Fair and himself "escalated" when the other three officers entered his apartment without permission.  (Docket Entry No. 32-11, at 25).  That resistance is important in deciding if Deputy Fair's use of force was objectively reasonable.  *See Lytle*, 560 F.3d at 411 (considering whether the suspect "is actively resisting arrest or attempting to evade arrest by flight" and whether the "suspect poses an immediate threat to the safety of the officers or others").

Osborne testified that the degree of force Deputy Fair used during their "scuffle"—grabbing Osborne's arms and subduing him with handcuffs—was relatively minor.  (Docket Entry No. 35, Ex. A, ¶ 9).  The Fifth Circuit cases finding excessive force used to respond to resistance involve either a greater degree of force or force applied after the plaintiff was already restrained and no longer resisting.  In *Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012), the officers "immediately resorted to taser and nightstick without attempting to use physical skill, negotiation, or even commands" to "'effectuate [the] suspect's compliance'" during a traffic stop.  *Id.* at 763.  In *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838 (5th Cir. 2009), the  arresting officer "delivered [a] knee strike to [the plaintiff's] thigh" even though the plaintiff "was in full compliance with all police orders," was "handcuffed," and "was offering no resistance." *Id.* at 846.  The City argued that "Peterson was belligerent and the knee strike was necessary to restrain him" because he "was pulling away from" the arresting officers.  *Id.*  The Fifth Circuit recognized that "some force may have been reasonable to restrain Peterson" before he had been handcuffed.  *Id.*  But the court concluded that summary judgment was inappropriate because "Peterson unequivocally testified that Officer Ballard

did not strike him until after he had been handcuffed" and "the evidence supporting the reasonableness of the police response [was] clearly disputed concerning whether continuing force in the form of a knee strike was justifiable *after* Peterson had been handcuffed." *Id.* at 847 (emphasis original). In *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008), the Fifth Circuit held that a police officer used excessive force when he forcefully slammed a suspect's face into a vehicle after subduing her and placing her in handcuffs. *Id.* at 501-02. In *Spann v. Rainey*, 987 F.2d 1110 (5th Cir. 1993), the officers "without any cause or justification" beat the plaintiff, who was "in 'diabetic shock,'" "with their hands and night sticks as well as other instruments." *Id.* at 1115. In *Ramirez v. Martinez*, 716 F.3d 369 (5th Cir. 2013), when the suspect merely pulled his arm out of the arresting officer's grasp, several officers "forced him to the ground without resistance on his part" and the arresting officer "tased him after subduing and handcuffing him." *Id.* at 378; *cf. Nottingham v. Finsterwald*, 455 F. App'x 460, 461 (5th Cir. 2011) (per curiam) (reversing grant of qualified immunity because there were genuine fact disputes about which defendants struck the plaintiff and whether he sustained his "injuries before or after he was handcuffed" and, "[u]nder [the plaintiff's] version of events, the Defendants would not have been justified in striking him after he was handcuffed as there [wa]s no evidence that he resisted at that time").

The case of *Collier v. Montgomery*, 569 F.3d 214 (5th Cir. 2009), is instructive. In *Collier*, the arresting officer's "use of force and the resulting bruises were not excessive under the circumstances" because the suspect "physically resisted when [the officer] attempted to place handcuffs on him." *Id.* at 219. The officer "grappled with [the suspect] for several seconds and was able to subdue [him] after pushing him onto the hood of the cruiser." *Id.* Similarly, in *Weldy v. Hatch*, 481 F. App'x 119 (5th Cir. 2012), the plaintiff "pulled away from" the arresting officer when

"he attempted to restrain her" and "began to struggle with the officers as they attempted to cuff her." *Id.* at 121. When the plaintiff "attempted to turn back toward the officers," they "forced her back face-down to the hood of the car," and after a "short scuffle on the hood," they successfully subdued her by "pull[ing] her arms high up across her back to cuff her wrists." *Id.* The Fifth Circuit affirmed the district court's grant of qualified immunity, concluding that the "evidence [did] not show that [the officers] struck [the plaintiff], attempted to hurt her, or used more force than necessary to accomplish the arrest." *Id.* at 123.

As in *Collier* and *Weldy*, summary judgment dismissing Osborne's excessive force claims is appropriate. Based on Osborne's own testimony that he resisted by pulling away from Deputy Fair to block the other deputies' entry and by pushing Deputy Fair with both hands, a reasonable jury could not find that Deputy Fair used unreasonable force. Deputy Fair's actions did not violate Osborne's clearly established rights. *See Brosseau v. Haugen*, 543 U.S. 194, 200–01 (2004) (reversing the Ninth Circuit's denial of qualified immunity because the cases addressing the particular situation the officer faced "taken together undoubtedly show[ed] that this area is one in which the result depends very much on the facts of each case" and therefore "suggest[ed] that Brosseau's actions fell in the hazy border between excessive and acceptable force." (quotations omitted)).

Deputy Fair is entitled to qualified immunity on the excessive-force claim. Because of this conclusion, the other deputies are also entitled to qualified immunity on Osborne's excessive-force claim. *See Kitchen*, 759 F.3d at 481 ("Defendants-Appellees correctly observe that bystander liability arises under *Hale* only where the plaintiff can allege and prove another officer's use of excessive force." (citation and quotations omitted)).

### 4.    The Supervisory Liability Claim Against Sergeant Gable

Sergeant Gable seeks summary judgment on Osborne's supervisory liability claim on the basis of qualified immunity.  "Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987) (citations omitted).   "'A supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Gates v. Texas Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)).

To "establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates." *Id.* (quoting *Gates*, 537 F.3d at 435) (emphasis in original).   "'A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights.'" *Id.* (quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)).   "A supervisor may also be liable for failure to supervise or train if: '(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'" *Id.* (quoting *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009)).

Osborne does not contend, and has not identified evidence showing, that Sergeant Gable "affirmatively participate[d] in the acts that cause[d] the [alleged] constitutional deprivation[s]."

36

*See Porter*, 659 F.3d at 446.  To the extent that Osborne asserts that Sergeant Gable is liable through bystander liability, Osborne does not point to any summary judgment evidence that Gable was "present at the scene of" the deputies' search and detention.  *See Whitley*, 726 F.3d at 646 (bystander "liability will not attach where an officer is not present at the scene of the constitutional violation").  To the contrary, Osborne states in his declaration that he did not encounter Sergeant Gable until after the deputies removed the handcuffs and released him, and he asked them for identifying information.  (Docket Entry No. 35, Ex. A, ¶ 18 ("At this point, [Deputy Guidry's] supervisor came over and introduced himself as Sgt. Gable and I told him 'I want names, badge numbers, and business cards' of everyone involved in the incident at my apartment.")).  Nor has Osborne identified any record evidence raising a triable fact issue material to whether Sergeant Gable implemented unconstitutional policies that caused a constitutional violation, or that he acted or failed to act with deliberate indifference.  *See id.*  Sergeant Gable is entitled to summary judgment on Osborne's supervisory liability claim.

## IV.    The Claims against Harris County

### A.    The Legal Standard for Municipal Liability

To hold Harris County liable for its officers' constitutional violations, Osborne must show that (1) the constitutional violation was caused as the direct result of the execution of an official "custom" or "policy"; (2) the custom or policy was approved or sanctioned by county's final policymaker; (3) the final policymaker acted with deliberate indifference; and (4) the custom or policy was the "moving force" behind the violation.  *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997); *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1416 (5th Cir. 1997) (en banc).  "Municipal liability cannot be sustained under a theory of *respondeat superior*.  [T]he

unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (alteration in original) (citing *Brown*, 520 U.S. at 403; *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)) (quotations omitted).

Official policy "usually exists in the form of written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* (internal quotation marks omitted). "A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010); *see also Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) ("Deliberate indifference to claims of such civil rights violations—tantamount to a custom or policy sufficient to support municipal liability under § 1983—may be inferred from a municipality's lack of appropriate response to repeated complaints of such violations.").

"A pattern requires similarity and specificity; prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Peterson*, 588 F.3d at 851 (internal quotation marks and alteration omitted). "Proof of a single instance of unconstitutional activity is [generally] not sufficient for § 1983 municipal liability." *Valentine Foundation v. Uphoff*, 211 F. App'x 276, 278 (5th Cir. 2006) (citing *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)). "Furthermore, a 'handful' of instances do not constitute a

pervasive custom or practice."  *Garza*, 2011 WL 3925020, at \*4 (citing *Pineda*, 291 F.3d at 329);

*Saenz v. Dallas Cnty. Cmty. College Dist*., 2011 WL 1935742, at \*8 (N.D. Tex. May 16, 2011).

    **B.**    **Analysis**

    Osborne argues that Harris County "ratified" the individual deputies' actions, citing

*Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985).  *Grandstaff*, however, has been limited

to its "extraordinary" facts.  *See Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir. 1986) ("The

*Grandstaff* panel emphasized the extraordinary facts of the case, and its analysis can be applied only

to equally extreme factual situations.").  The court in *Coon* described the *Grandstaff* facts, which

are plainly distinguishable from the facts shown in the present record.  The *Coon* court stated:

> *Grandstaff* . . . does not stand for the broad proposition that if a policymaker defends
> his subordinates and if those subordinates are later found to have broken the law,
> then the illegal behavior can be assumed to have resulted from an official policy.
> Rather, *Grandstaff* affirmed a judgment against a Texas city on a highly peculiar set
> of facts: in response to a minor traffic violation, three patrol cars engaged in a high
> speed chase during which they fired wildly at the suspected misdemeanant; the
> object of this chase took refuge on an innocent person's ranch, where the entire night
> shift of the city police force converged and proceeded to direct hails of gunfire at
> anything that moved; although nobody except the police was ever shown to have
> fired a shot, the innocent rancher was killed when the police shot him in the back as
> he was emerging from his own vehicle; after this "incompetent and catastrophic
> performance," which involved a whole series of abusive acts, the officers'
> supervisors "denied their failures and concerned themselves only with unworthy, if
> not despicable, means to avoid legal liability."

*Coon*, 780 F.2d at 1161 (internal citations omitted).  In *Grandstaff*, "the entire night shift" directed

"hails of gunfire" at someone accused of a minor traffic violation and killed an innocent bystander.

*See* 767 F.2d at 165.  Here, one officer—Deputy Fair—used some force to respond to Osborne's

resistance to the other three deputies' unlawful search of his apartment.

    Fifth Circuit precedent has limited ratification to "extreme factual situations."  *See Snyder*

*v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998).  That precedent precludes finding that this case

presents an extreme factual situation.  *Compare Grandstaff*, 767 F.2d 161, *with Snyder*, 142 F.3d at 798 (refusing to find ratification in a case involving an officer shooting a fleeing suspect in the back).  The Fifth Circuit has also explained that a policymaker who defends conduct later shown to be unlawful has not ratified that conduct as a basis for municipal liability.  *See Coon*, 780 F.2d at 1161–62 (the precedent "does not stand for the broad proposition that if a policymaker defends his subordinates and if those subordinates are later found to have broken the law, then the illegal behavior can be assumed to have resulted from an official policy").  The Supreme Court has cautioned, and the Fifth Circuit has reiterated, that ratification liability must be limited to prevent it from becoming a basis for a municipality's vicarious liability for its employees.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988).  Fifth Circuit precedent forecloses ratification liability on the basis of the record in this case.

Osborne also cites *City of Canton v. Harris*, 489 U.S. 378 (1989), which allows municipal liability when a city's failure to train its officers amounts to deliberate indifference.  Osborne did not plead a failure to train claim in his amended complaint, does not allege a pattern of similar constitutional violations, and does not argue that the constitutional deprivation he alleges stemmed from inadequate training.  *See Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) ("A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." (quotations omitted)).  And the record does not support a claim that Harris Count's training policies were facially unlawful or otherwise promulgated, maintained, or administered with deliberate indifference.  *See id.* ("Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a

known or obvious consequence of his action." (quotations and alterations omitted)).  To the extent that Osborne asserts this theory of municipal liability, it fails on the summary judgment record.

The County's motion for summary judgment dismissing Osborne's municipal liability claim is granted.

## IV.    Conclusion

The defendants' motion for summary judgment, (Docket Entry No. 32), is granted in part and denied in part.  Harris County's motion for summary judgment dismissing Osborne's municipal liability claim is granted.  Sergeant Gable's motion for summary judgment dismissing Osborne's supervisory liability claim is granted.  The individual deputies' motion for summary judgment dismissing Osborne's claims for excessive force and unlawful detention is granted.  The individual deputies' motion for summary judgment dismissing Osborne's claim for unlawful entry and search is denied.  Counsel for the remaining parties are ordered to appear for a pretrial conference on **April 9, 2015**, at 3:00 p.m. in Courtroom 11-B at 515 Rusk Street, Houston, Texas, 77002, to set a schedule and plan to resolve the remaining claims.

SIGNED on March 31, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

41